**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**
**CIVIL ACTION NO.  3:17-CV-755-CHL**

**JOEY GADDIS, et al.,**                                                                                     **Plaintiffs,**

**v.**

**TROOPER ANTHONY HARRISON,**                                                             **Defendant.**

**MEMORANDUM OPINION AND ORDER**

Before the Court is the Motion for Summary Judgment filed by Defendant Trooper Anthony Harrison ("Harrison").  (DN 48.)  Plaintiffs Joey Gaddis ("Gaddis"), Damon Johnson ("Johnson"), and Cynthia West ("West") (collectively "Plaintiffs") filed a response (DN 57), and Harrison filed a reply (DN 60).  Without requesting leave of Court, Plaintiffs then filed what was captioned a reply but was really a surreply.  (DN 61.)[1]  Because Harrison did not raise any new arguments in his reply, Plaintiffs' surreply was unwarranted.  Further, Plaintiffs did not request leave of Court prior to filing their surreply as required.  Accordingly, Plaintiffs' surreply will not be considered by the Court.  Therefore, the motion (DN 48) is ripe for review.

For the reasons set forth below, Harrison's Motion for Summary Judgment (DN 48) is **GRANTED IN PART** and **DENIED IN PART**.

---

[1] Whether to permit a party to file a surreply is a matter left to the trial court's discretion.  *See Key v. Shelby Cnty.*, 551 F. App'x 262, 265 (6th Cir.2014) (citing *Eng'g & Mfg. Servs., LLC v. Ashton*, 387 F. App'x 575, 583 (6th Cir.2010) and *Tanielian v. DaimlerChrysler Corp.*, 108 F. App'x 386, 387 (6th Cir.2004)).  "Although the Federal Rules of Civil Procedure do not expressly permit the filing of sur-replies, such filings may be allowed in the appropriate circumstances, especially '[w]hen new submissions and/or arguments are included in a reply brief, and a nonmovant's ability to respond to the new evidence has been vitiated.' "  *Id.* at 265 (quoting *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 481 (6th Cir.2003)).  However, surreplies are "highly disfavored, as they usually are a strategic effort by the nonmoving party to have the last word on a matter."  *Liberty Legal Found. v. Nat'l Democratic Party*, 875 F. Supp. 2d 791, 797 (W.D. Tenn. 2012) (quoting *In re Enron Corp. Secs.*, 465 F. Supp. 2d 687, 691 n.4 (S.D. Tex. 2006)).

## I.     BACKGROUND

On September 24, 2017, Plaintiffs were members of a road construction crew working on Kentucky Highway 31 West in Meade County, Kentucky.  (DN 1, at PageID # 3.)  Around 7:00 or 8:00 PM, Harrison, an off-duty Kentucky state trooper, drove through the Plaintiffs' work zone on his way to Louisville, and his vehicle was sprayed with water from the paving machines.  (DN 57-1, at PageID # 310-12.)  Harrison did not stop, report the situation to dispatch, or confront the construction crew at that time.  (DN 57, at PageID # 288.)  Instead, he continued on to Louisville. (DN 57-1, at PageID # 310.)

Later that night, around 11:30 PM, Harrison was making the return trip along the same route.  (*Id.*)  Harrison encountered the work zone again.  (*Id.* at 312-13.)  He saw an electrical sign indicating "Road work ahead" and some traffic cones.  (*Id.* at 313.)  Shortly thereafter, he encountered the construction crew workers.  (*Id.* at 314.)

The crewmembers observed Harrison driving too fast through the construction zone, and the flagger yelled for him to slow down.  (DN 57, at PageID # 288.)  Harrison instead sped up and nearly hit one of the crewmembers, Plaintiff West, before locking his brakes and coming to a stop near one of the paving machines.  (*Id.*)  West had to jump out of the way to avoid being hit by Harrison's car.  (DN 57-2, at PageID # 326.)  When the car came to a stop, it was blocking the only lane of traffic.  (DN 57-1, at PageID # 316.)  Harrison's car did not have police lights; it had hazard lights, but Harrison did not turn them on because there were no cars behind him.  (*Id.*) Since there were no vehicles behind him, he was not concerned about creating a traffic hazard. (*Id.*)

Harrison got out of the car and started talking to one of the crewmembers.  (DN 57-2, at PageID # 327.)  West approached them to try and diffuse the situation.  (*Id.*)  She told Harrison

that he needed to slow down. (*Id.*) Harrison flashed his badge in West's face and told her that he did not care what the speed limit was, he could go as fast as he wanted because he was a state trooper. (*Id.* at 328.) Harrison said there was no warning about the construction work being done. (*Id.*) West pointed out that there were signs, cones, lights, and flaggers. (*Id.*) Harrison shoved West out of the way and went to talk to the other crewmembers. (*Id.*) West took out her phone and tried to call someone for help because she was concerned about the situation escalating and about Harrison's car still blocking the only lane of traffic. (*Id.* at 329.)

At this point, another crewmember, Plaintiff Gaddis, used a phone to begin filming the crewmembers' encounter with Harrison. (DN 57, at PageID # 289.) Harrison continued to yell about the lack of warning to drivers about the construction zone. (Conventional Exhibit 6, Incident Video, Part 1 at 00:01.) West told him not to yell at her, and Harrison responded, "I will yell at you." (*Id.* at 00:04-00:07.) West told him not to yell at her again, and Harrison responded, "Or what? Or what?" (*Id.* at 00:07-00:08.) West asked Harrison for his name, and he responded, "Trooper Harrison, that's my name." (*Id.* at 00:08-00:11.)

Harrison noticed that Gaddis was filming him and lunged at Gaddis, knocking the phone out of his hands. (*Id.* at 00:11.) West and Gaddis both believed that Harrison was trying to grab Gaddis's neck. (DN 57-2, at PageID # 330; DN 57-3, at PageID # 335.) Regarding the encounter, Gaddis said, "[T]he only thing I could feel was something going around my neck." (DN 57-3, at PageID # 335.)

After Harrison lunged at Gaddis, another crewmember, Plaintiff Johnson, approached the scrum to try to diffuse the situation. (*Id.*) Harrison punched Johnson twice. (DN 48-3, at PageID # 207-08.) Another crewmember was behind Harrison and "tried to grab him to keep him from coming at [the crewmembers] again, but . . . for the most part [they] couldn't stop him until [they]

got to the ground." (DN 57-3, at PageID # 335.) Eventually, Harrison was overpowered and pinned to the ground by three of the crewmembers. (DN 57, at PageID # 289.) While he was pinned to the ground, a crewmember asked Harrison if he had a gun, and Harrison responded, "Yeah, that's my f\*\*king gun, yeah." (Conventional Exhibit 6, Incident Video, Part 2 at 00:02-00:004.)

Shortly thereafter, more state troopers, including Sergeant Jeremy Mabe ("Mabe"), arrived. (DN 1, at PageID # 5.) The crewmembers let Harrison up and he went and stood by his vehicle. (*Id.*) The state troopers watched Gaddis's video recording of the encounter. (*Id.* at 5-6.) Harrison was then permitted to get in his vehicle and leave. (*Id.* at 6.) The crew members were photographed by the state troopers and asked about the incident. (*Id.*)

## II.     JURISDICTION

The Court has federal question jurisdiction over Plaintiffs' federal § 1983 claims and supplemental jurisdiction over Plaintiffs' state law claims. *See* 28 U.S.C. §§ 1331, 1343, and 1367(a).

## III.    STANDARD OF REVIEW

In ruling on a motion for summary judgment, the Court must determine whether there is any genuine issue of material fact that would preclude entry of judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of stating the basis for the motion and identifying evidence in the record that demonstrates an absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the moving party satisfies the burden, the non-moving party must then produce specific evidence proving the existence of a genuine issue of fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

While the Court must view the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show the existence of some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citation omitted). Rather, the non-moving party must present specific facts proving that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "The mere existence of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

## IV.    DISCUSSION

While Plaintiffs initially brought suit against both Harrison and Mabe, Plaintiffs' claims against Mabe were previously dismissed. (DN 9.) Plaintiffs' remaining claims against Harrison are 42 U.S.C. § 1983 claims for violations of their Fourth, Fifth, and Fourteenth Amendment rights to be free from unreasonable seizures, excessive force, and false arrest and state law claims for assault, battery, and outrage/intentional infliction of emotional distress. (DN 1.)

In their response to Harrison's Motion for Summary Judgment, Plaintiffs also claimed that Harrison violated Gaddis's First Amendment right to film a police officer. (DN 57, at PageID # 298.) However, that claim was not raised in Plaintiffs' complaint. (DN 1.) "To the extent [Plaintiffs] seek[ ] to expand [their] claims to assert new theories, [they] may not do so in response to summary judgment or on appeal." *Bridgeport Music, Inc. v. WB Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007). *See also Tucker v. Union of Needletrades, Indus. and Textile Employees*, 407 F.3d 784, 788 (6th Cir. 2005) (holding that a plaintiff may not raise a new claim at the summary judgment stage). Therefore, the Court will not address that alleged violation.

Harrison now moves for summary judgment on all claims against him.  (DN 48.)

## A.      Plaintiffs' Federal Claims Under 42 U.S.C. § 1983

To establish a § 1983 claim, "a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law."  *Doe v. Miami Univ.*, 882 F.3d 579, 595 (6th Cir. 2018).

Here, neither party disputes that Harrison was acting under the color of state law.  Harrison testified that state troopers have a duty to investigate road hazards, such investigations are within the scope of his duties as a state trooper, and he was acting as a state trooper conducting such an investigation during the incident.  (DN 48-2, at PageID # 185; DN 57-1, at PageID # 317-18.) Harrison also testified that the reason he stopped was to investigate why the crewmembers were spraying the road because it "was actually causing a traffic hazard."  (DN 48-2, at PageID # 180.) Harrison's police practices expert, Dr. William Gaut, testified that Harrison approached the crewmembers in order to "correct a hazardous traffic situation."  (DN 48-9, at PageID # 268.) When Harrison confronted the crewmembers he displayed his badge and identified himself as a state trooper.  (DN 48-2, at PageID # 190; DN 57-2, at PageID # 328; Conventional Exhibit 6, Incident Video, Part 1 at 00:08-00:11.)  Johnson testified that he heard Harrison identify himself as a state trooper.  (DN 48-3, at PageID # 212.)  Gaddis testified that he knew Harrison was a state trooper and that Harrison was "five feet away from [him] with a badge."  (DN 48-4, at PageID # 230.)  West testified that Harrison flashed his badge at her and said he was a state trooper.  (DN 48-5, at PageID # 244.)  Thus, there is no genuine issue of fact as to whether Harrison was acting in his capacity as a state trooper during the incident.

Instead, the Parties' arguments all turn on the remaining element of Plaintiffs' § 1983 claims: whether a jury could find the "the deprivation of a right secured by the Constitution or laws of the United States." *Doe*, 882 F.3d at 595.

### 1. Fourth Amendment Protection Against Unreasonable Seizures and Excessive Force

Plaintiffs claim that Harrison violated their Fourth Amendment right to be free from unreasonable seizures and excessive force. (DN 1, at PageID # 6.) Harrison argues that Plaintiffs were not seized; if they were seized, the seizure was not unreasonable because there was reasonable suspicion and no excessive force was used; and even if the seizure was unreasonable, Harrison is shielded by qualified immunity. (DN 48, at PageID # 154-67.)

#### a) Seizure

A seizure occurs either "(1) through the use of physical force by the officer; or (2) through 'show of authority' by the officer, in which the suspect actually submits." *Dillingham v. Millsaps*, 809 F. Supp. 2d 820, 836 (E.D. Tenn. 2011) (citing *Peete v. Metro Gov't of Nashville & Davidson Cnty.*, 486 F.3d 217, 220 (6th Cir. 2007)). The key is whether, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). Factors that may lead an individual to believe he is not free to leave include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.* Each plaintiff's Fourth Amendment claim must be separately analyzed. *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978).

Here, the record contains sufficient facts for a reasonable jury to conclude that they were seized. As to the Plaintiffs as a group, Harrison used his vehicle to block the only path of ingress

and egress available to Plaintiffs.  (DN 57-1, at PageID # 316.)  The video taken by Gaddis shows that, throughout the encounter, Harrison's "language or tone of voice indicat[ed] that compliance with [his] request might be compelled." *Mendenhall*, 446 U.S. at 554.  Harrison identified himself as a state trooper, flashed his badge, spoke loudly and aggressively to the Plaintiffs  and, toward the end of the encounter, told the Plaintiffs that he had a gun.  (DN 57-2, PageID # 328; Conventional Exhibit 6, Incident Video, Part 2 at 00:02-00:04.)  Taken together, these facts could lead a jury to conclude that "a reasonable person would have believed that he was not free to leave." *Mendenhall*, 446 U.S. at 554.

As to Plaintiff Cynthia West, the video shows that much of Harrison's shouting was directed at her.  (Conventional Exhibit 6, Incident Video, Part 1 at 00:04-00:011.)  When West tells Harrison not to yell at her, he responds with, "I will yell at you," and, "Or what?" (*Id.*)  West testified that she was shoved and that she took out her phone and attempted to call for help.  (DN 57-2, PageID # 328-29.)  She also testified that "if he's a state trooper stopping for a reason to stop, of course I'm going to listen." (*Id.* at 331.)  Thus, there is a genuine dispute of fact as to whether Harrison's actions were enough for West to have felt that she was not free to leave.

As to Plaintiff Joey Gaddis, the video shows Harrison reaching out toward the phone that Gaddis was using to film the incident.  (Conventional Exhibit 6, Incident Video, Part 1 at 00:11.)  Gaddis testified that Harrison "lunged right towards me" and that he could feel "something going around my neck."  (DN 57-3, at PageID # 335.)  He went on to say that Harrison "grabbed the collar of [his] shirt and tried to get the phone." (*Id.* at 337.)  Thus, Harrison's physical touching of Gaddis demonstrates a genuine dispute of fact as to whether Harrison's actions led Gaddis to believe that he was not free to leave.

As to Plaintiff Damon Johnson, he was grabbed by Harrison and struck several times in the face and neck.  (DN 48-3, at PageID # 207-08; DN 57-2, at PageID # 330.)  This physical touching, plus Harrison's tone of voice and language, admitted possession of a weapon, and stopped car that blocked ingress and egress from the construction site, could have led Johnson to believe that he was not free to leave.  Therefore, there is a genuine dispute of fact as to whether Johnson was seized.

### b)    Reasonable Suspicion

Harrison next argues that even if the Plaintiffs were seized, the seizure was legal because it was supported by reasonable suspicion.  (DN 48-1, at PageID # 159.)  Reasonable suspicion occurs when "an officer possesses 'a particularized and objective basis for suspecting the particular person . . . of criminal activity' based on 'specific and articulable facts.' "  *Smoak v. Hall*, 460 F.3d 768, 778-79 (6th Cir. 2006) (quoting *Houston v. Clark Cnty. Sheriff Deputy John Does 1-5*, 174 F.3d 809, 813-14 (6th Cir. 1999)).  Here, Harrison never suspected any of the crewmembers of criminal activity.  He approached the worksite to address a potential road or traffic hazard, not potential criminality.  (DN 48-2, at PageID # 180, 185; DN 57-1, at PageID # 317-18.)  Harrison argues he "had a reasonable suspicion to believe that a violation and/or safety hazard was occurring at the worksite that needed to be addressed and/or investigated."  (DN 48-1, at PageID # 160.)  But even if the Court were to accept that explanation, Harrison has not pointed to any traffic laws, ordinances, or other regulations that he was seeking to enforce.

In *Swagler v. Sheridan*, 837 F. Supp. 2d 509 (D. Md. 2011), Maryland state troopers arrested a group of pro-life demonstrators in Hartford County for alleged violations of a traffic ordinance.  The officers claimed they responded to the demonstrators' activities and arrested them because the demonstrators did not have a permit and because their activities were creating a traffic

hazard. *Id.* at 526-27.  When a demonstrator asked one of the troopers what traffic ordinance required them to have a permit, the trooper responded, "It's not what the law is; it's what I'm telling you the law is." *Id.* at 517.  In fact, Hartford County had no such ordinance. *Id.*  The *Swagler* court held, "The Troopers purportedly acted according to a Hartford County permit ordinance—however, not a single Trooper bothered to locate, read, evaluate, or understand the ordinance before suppressing the Plaintiffs' speech and subsequently arresting them. This, by itself is unreasonable." *Id.* at 536.

Here, like the troopers in *Swagler*, the reasonable suspicion Harrison claims that he was attempting to address is a traffic hazard.  (DN 48-2, at PageID # 180, 185; DN 57-1, at PageID # 317-18.)  But Harrison has not pointed to any laws or ordinances that would support his seizure of the Plaintiffs.  In fact, Harrison's remarks about the ordinance (or lack thereof) mirror the comments of the state trooper in *Swagler*.  Harrison, in response to questioning about whether he was acting pursuant to a law, said, "There is no law that I know of . . . I don't know what their standards are. I can't speak on their standards. I'm just going by what—how I feel about it."  (DN 57-1, at PageID # 317; *Compare id.*, *with Swagler*, 837 F. Supp. 2d at 517 ("It's not what the law is; it's what I'm telling you the law is.").)  Reasonable suspicion must be supported by more than how a person feels; it requires "a particularized and objective basis." *Smoak*, 460 F.3d at 778-79. Without a law or ordinance to support his actions, Harrison lacked such a basis and, therefore, has not demonstrated that he had reasonable suspicion to seize the Plaintiffs.

### c)    **Excessive Force**

Harrison next argues that if there was a seizure, it did not involve excessive force.  (DN 48-1, at PageID # 164.)  A claim that a seizure was unreasonable because a police officer used excessive force during an investigatory stop is analyzed under the Fourth Amendment's

reasonableness standard.  *See Graham v. Connor*, 490 U.S. 386, 395 (1989).  That standard "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake."  *Id.* at 396 (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)).  When conducting an investigatory stop an officer has the right to use an appropriate amount of force to effectuate that stop.  *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 22-27 (1968)).  To determine whether that force was reasonable, the Court must look "to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id.* (citing *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)).  Finally, reasonableness is an objective standard and "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Id.* (citing *Terry*, 392 U.S. at 20-22.)  It must allow "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  *Id.* at 397.

Applying that standard here, a jury could conclude that the force Harrison used during the investigatory stop was beyond what was needed to effectuate that stop. In other words, it could find that the governmental issue at stake—investigating a potential traffic hazard—was not appropriately balanced against the force used.[2]  Using the *Graham* factors, the severity of the crime

---

[2] Plaintiffs suggest that Harrison's reason for stopping (the governmental issue at stake) was not to perform his discretionary duties in conducting the investigatory stop but because he was upset that his car had been sprayed with water.  (*See* DN 57, at PageID # 292 ("It was only at this time, after visiting with his girlfriend, that he encountered the same worksite with the same conditions, that Trooper Harrison, irritated that his car had been sprayed again, chose to stop and address that fact.").)  However, Plaintiffs also state that both Parties agree that Harrison was performing his discretionary duties as a state trooper when he stopped to investigate the worksite.  While a different analysis would apply if Harrison had stopped in his personal capacity, the present motion does not require the Court to resolve that issue.  The Court will therefore assume that the incident took place within the context of Harrison conducting an

at issue was negligible since Harrison was investigating an alleged traffic hazard, not a crime. None of the crew members posed an immediate danger to the safety of Harrison or anyone else. None of the crew members was attempting to flee or evade arrest or Harrison's investigation.  For those same reasons, this was also not a situation where Harrison was "forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Id.*  Harrison was responding to some water in the roadway, not an ongoing and unpredictable emergency situation. Therefore, a jury could conclude that Harrison's methods—using his car to block the only lane of traffic, shouting at the crewmembers, trying to knock the phone out of Gaddis's hand (which Harrison admitted was an "overreaction" to the fact that he did not like being recorded (DN 57-1, at PageID # 319-20)), hitting and shoving crew members, and carrying a weapon—were not an appropriate amount of force to investigate a potential traffic hazard and were not what an objectively reasonable officer would have done.

### d) Qualified Immunity

Lastly, Harrison claims that even if there was a seizure and it was unreasonable or that he used excessive force, he is nevertheless shielded by the doctrine of qualified immunity.  (DN 48-1, at PageID # 154.)  "Police officers are immune from civil liability unless, in the course of performing their discretionary functions, they violate the plaintiff's clearly established constitutional rights."  *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015) (citing *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012)).  This judicially-created doctrine provides "breathing room [for officers] to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law." *Id.*  (quoting *Stanton v. Sims*, 571 U.S. 3, 6 (2013)); *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).  Once an officer raises the

---

investigatory stop as a state trooper rather than the context of Harrison confronting the work crew as a private citizen who was upset about his car being sprayed.

defense the plaintiff has the burden of showing that the officer is not entitled to qualified immunity. *See, e.g.*, *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013).  To determine whether an officer is entitled to qualified immunity, the Court asks: "(1) whether the facts, viewed in the light most favorable to the plaintiff, show that the officer's conduct violated a constitutional right; and (2) whether that right was clearly established at the time of the challenged conduct."  *Nelson v. City of Battle Creek*, 802 F. App'x 983, 986 (6th Cir. 2020) (citing *Burgess*, 735 F.3d at 472).

As discussed above, Plaintiffs have pointed to sufficient facts in the record for a jury to conclude that Harrison violated their Fourth Amendment rights by seizing them without reasonable suspicion and with excessive force.  Thus, in the context of Harrison's assertion of qualified immunity, taking the facts in the light most favorable to Plaintiffs, constitutional violations occurred.  The Court must now determine whether the second prong of the qualified immunity test is met, i.e., whether the rights claimed to have been violated are "clearly established" rights. Clearly established rights are those that are "sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Creighton*, 483 U.S. at 640.  The purpose of the rule "is to ensure that officials are on notice that their alleged conduct was unconstitutional." *Baynes v. Cleland*, 799 F.3d 600, 610 (6th Cir. 2015).  *See also Hope v. Pelzer*, 536 U.S 730, 741 (2002) ("[T]he salient question . . . is whether the state of the law [at the time of the alleged violation] gave respondents fair warning that their alleged treatment of [the plaintiff] was unconstitutional.");  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) ("If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful.").

The Supreme Court "has 'repeatedly told courts . . . not to define clearly established law at a high level of generality.'" *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (quoting *City of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1775-76 (2015)).  To avoid such general statements courts will often describe the right in terms of the factual circumstances in which it arose.  For example, in *Baker v. Union Twp.*, 587 F. App'x 229, 234 (6th Cir. 2014), police tased a suspect who was standing at the top of a staircase.  The suspect was not resisting arrest, fleeing, or in an aggressive stance, and otherwise posed no risk to the officers.  *Id.*  In order to comport with the "mandate that rights not be defined at 'a high level of generality,'" the court described the plaintiff's violated right as the "right not to be shot with a taser without warning, while offering no resistance to arrest, and while standing on an observably elevated surface."  *Id.* at 235 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)).

Defining clearly established rights is a balancing act.  The right must be defined more specifically than a general prohibition, *Sample v. Bailey*, 409 F.3d 689, 698 (6th Cir. 2005), but not so specific that qualified immunity applies "unless the very action in question has previously been held unlawful."  *Creighton*, 483 U.S. at 640.  Thus, "in an obvious case, [generalized] standards can 'clearly establish' the answer, even without a body of relevant case law."  *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004).  *See also Lyons v. City of Xenia*, 417 F.3d 565, 579 (6th Cir. 2005) ("*Brosseau* leaves open [a] path[ ] for showing that officers were on notice that they were violating a 'clearly established' constitutional right [ ] where the violation was sufficiently 'obvious' under the general standards of constitutional care that the plaintiff need not show 'a body' of 'materially similar' case law . . . .")  There need not be "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."  *al-*

*Kidd*, 563 U.S. at 741.[3]  Therefore, a plaintiff may demonstrate that a right was clearly established for the purpose of a § 1983 claim by demonstrating either that (1) "a violation 'was sufficiently obvious under the general standard of constitutional care [such] that the plaintiff need not show a body of materially similar case law'" or (2) "an officer 'fail[ed] to adhere to a particularized body of precedent that squarely governs the case.'"  *Garcia v. Dykstra*, 260 F. App'x 887, 899 (6th Cir. 2008) (quoting *Lyons*, 417 F.3d at 579). When determining whether a right is clearly established, the Court looks first to the Supreme Court, then to the Sixth Circuit, then to other circuits. *Andrews v. Hickman Cnty.*, 700 F.3d 845, 853 (6th Cir. 2012).

The rights at issue here could be articulated any number of ways.  "The right of employees working at their job site, who are not suspected of a crime and not under arrest, to be free from police officers using force against them."  Or "the right not to be seized by a police officer who is attempting to enforce a law that he cannot identify and that may not exist."  Or "the right to not be subjected to force and gratuitous violence from a police officer if one is not a criminal suspect." However, the Court is mindful that too specific an articulation of the right at issue would essentially ensure the application of qualified immunity in nearly every case, an outcome that the Court does not believe is consistent with the purpose of qualified immunity.[4]  Regardless of how

---

[3] *See also Hope*, 536 U.S. at 738 (holding that where the facts as alleged by plaintiff made the Eighth Amendment violation obvious, a materially similar case was unnecessary to establish that the right was clearly established); *Baynes*, 799 F.3d at 611 ("[T]he precise factual scenario need not have been found unconstitutional . . . for the right to be 'clearly established[,]' . . . [and] government officials can still be on notice that their conduct violates established law even in novel factual circumstances."); *Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1291-92 (11th Cir. 2009) (citing *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005)) ("A right may be clearly established for qualified immunity purposes . . . [by] conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law."); *Hutchinson v. Lemmon*, 436 F. App'x 210, 215 (4th Cir. 2011) ("We repeatedly have held that there is no requirement that the precise right allegedly violated already have been recognized specifically by a court before such right may be held 'clearly established' for qualified immunity purposes.").

[4] As the Supreme Court has explained, qualified immunity is intended to balance the thought that "action[s] for damages may offer the only realistic avenue for vindication of constitutional guarantees," against the "substantial social costs" entailed by suits against government officials. *Creighton*, 483 U.S. at 638 (quoting and citing *Harlow*, 457 U.S. at 818). Thus, Supreme Court "cases have accommodated these conflicting concerns by generally providing government officials performing discretionary functions with a qualified immunity, shielding them from civil damages

the right is articulated, case law provides that the right is clearly established only if an objectively reasonable officer in Harrison's position would have known that his actions were violating that right.  *Creighton*, 483 U.S. at 640.  Taking the facts as alleged in the light most favorable to the nonmoving Plaintiffs here, Harrison's conduct violated clearly established law.

A reasonable officer in Harrison's position would know that seizing, choking, and punching members of a road crew is so far beyond the amount of force needed to investigate a slippery road as to be an "obvious" violation of the Plaintiffs' rights.  This violation is clear both from the "general standard of constitutional care" and from application of existing precedent. *Garcia*, 260 F. App'x at 899 (quoting *Lyons*, 417 F.3d at 579).  For example, courts have previously found such rights to be clearly established as: the right "not to be shot unless [one] [is] perceived to pose a threat to the pursuing officers or to others during flight," *Sample*, 409 F.3d at 698 (quoting *Robinson v. Bibb*, 840 F.2d 349, 351 (6th Cir. 1988); the right to be free from forceful or overly tight handcuffing, *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 278 (6th Cir. 2020); the right of "a non-resistant subject" to be free from being tased, *Kijowski v. City of Niles*, 372 F. App'x 595, 601 (6th Cir. 2010); the right not to be pepper sprayed if not being arrested or resisting arrest, *Grawey v. Drury*, 567 F.3d 302, 314 (6th Cir. 2009); "the right to be free from physical force when one is not resisting the police," *Wysong v. City of Heath*, 260 F. App'x 848, 856 (6th Cir. 2008); the "right to be free from the gratuitous application of force against his person once he has been neutralized," *Davis v. City of E. Cleveland*, No. 1:03 CV 2075, 2006 WL 753129, at *6 (N.D. Ohio Mar. 22, 2006); and "the right of people who pose no safety risk to the police to be free from gratuitous violence during arrest," *Pigram v. Chaudoin*, 199 F. App'x 509, 513 (6th Cir. 2006).

---

liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Id.*

This Court sees no reason that non-resistant subjects, who are not under arrest, pose no safety risk, and are not attempting to flee, should be free from being shot, tightly handcuffed, pepper sprayed, and tased but not free from random punches and the other aggressive behavior in which Harrison engaged. Indeed, the general reasoning employed by these cases suggests that it is the use of violence itself that violates such a plaintiff's rights under those circumstances rather than the use of any specific implement of violence. *See Baynes*, 799 F.3d at 612 (citing *Hope*, 536 U.S. at 742-44) ("Ultimately, . . . an action's unlawfulness can be 'clearly established' from direct holdings, from specific examples describing certain conduct as prohibited, or from the general reasoning that a court employs."). Further, the fact that Harrison here was not responding to any specific crime or acting under any particular legal authority but rather his own "feeling" about what the law should be takes his conduct even further afield from the realm of what he was on notice was appropriate.

As the facts taken in the light most favorable to the Plaintiffs establish violations of Plaintiffs' clearly-established constitutional rights, qualified immunity does not shield Harrison from Plaintiffs' unreasonable seizure and excessive force claims.

## 2. Fourth Amendment Protection Against False Arrest

Plaintiffs also claim that Harrison violated their Fourth Amendment right to be free from false arrest. (DN 1, at PageID # 6.) To establish a claim for false arrest, a plaintiff must prove: "(1) that there was an arrest; and (2) that the arrest was made without probable cause." *James v. City of Wilkes-Barre*, 700 F.3d 675, 680 (3rd Cir. 2012). While some states have a broader definition of false arrest that include physical confinement or restriction of movement without an actual arrest,[5] federal law limits the claim to an actual arrest. *Id.* Here, the Parties do not dispute

---

[5] *See, e.g.*, *Brewer v. Rogers*, No. 08-23-JBC, 2009 WL 2242389, at *1-2 (E.D. Ky. July 24, 2009) ("Although both the terms 'false arrest' and 'false imprisonment' are used in Kentucky case law, the Kentucky Supreme Court has

that none of the Plaintiffs was actually arrested.  Gaddis, Johnson, and West all testified in their individual depositions that they were never handcuffed or arrested by Harrison or any other law enforcement officer on the night of the incident.  (DN 48-4, at PageID # 232; DN 48-3, at PageID # 216; DN 48-5, at PageID # 238.)  Because none of the Plaintiffs was actually arrested by Harrison or anyone else, there was no violation of their Fourth Amendment right to be free from false arrest. Accordingly, Harrison's motion will be **GRANTED** as to the Plaintiffs' false arrest claim.

### 3.    Fourteenth Amendment Equal Protection

Plaintiffs' last federal claim is that Harrison violated their Fourteenth Amendment right to due process of law.  (DN 1, at PageID # 6.)  Excessive force claims like Plaintiffs' may be brought under the Fourth, Eighth, or Fourteenth Amendments.  *See Hopper v. Plummer*, 887 F.3d 744, 751 (6th Cir. 2018).  The Fourth Amendment applies to free persons, the Eighth Amendment to convicted persons, and the Fourteenth Amendment to persons somewhere in between.  *See id.* Here, Plaintiffs were at all times free persons.  Harrison did not approach the worksite because of any suspected criminal activity, and while the crewmembers may have been seized, they were never detained as criminal suspects.  (DN 60-5, at PageID # 383.)  Therefore, any excessive force claim must be brought under the Fourth Amendment.  Accordingly, Harrison's motion will be **GRANTED** as to the Plaintiffs' Fourteenth Amendment claims.

### B.    Plaintiffs' State Law Claims

Harrison also invoked qualified official immunity as to Plaintiffs' state law claims.  (DN 48-1, at PageID # 169.)  "Qualified official immunity applies to the negligent performance by a

---

determined that it considers the two to be different names for the same basic tort and that the proper name for the tort is 'false imprisonment.' . . . Under Kentucky law, to be found liable for the tort of false imprisonment, the defendant must have intentionally confined the victim of the alleged tort and that confinement must have been unlawful."); *Jefferson Dry Goods Co. v. Stoess*, 199 S.W.2d 994, 996 (Ky. 1947) (holding that the elements of false arrest are "a detention of the person" and that the detention was unlawful).

public officer or employee of (1) discretionary acts or functions[,] *i.e.,* those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment; (2) in good faith; and (3) within the scope of the employee's authority." *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001). The standard is similar to the federal qualified immunity defense. *See King v. Taylor*, 694 F.3d 650, 665 (6th Cir. 2012).

### 1.   Assault and Battery

Plaintiffs' first state claim is that Harrison committed assault and battery against them. (DN-1, at PageID # 9-11.) No party disputes that Harrison was performing a discretionary function within the scope of his authority as a state trooper when he approached the worksite to investigate the potential road hazard. (DN 57-1, at PageID # 315-18; DN 57-2, at PageID # 328.) The question then is whether Harrison was acting in bad faith. *Yanero*, 65 S.W.3d at 522. A public official's bad faith "can be predicated on a violation of a constitutional, statutory, or other clearly established right which a person in the public employee's position presumptively would have known was afforded to a person in the plaintiff's position[,] *i.e.,* objective unreasonableness." *Id.* at 523.

Here, there is a genuine dispute as to whether Harrison violated the Plaintiffs' clearly established Fourth Amendment rights to be free from excessive force and unreasonable seizure. If Plaintiffs are able to prove that such a violation occurred, then they may demonstrate that Harrison was acting in bad faith, and qualified official immunity would not apply. Accordingly, Harrison's motion will be **DENIED** as to the Plaintiffs' state law assault and battery claims.

### 2.   Outrage

Plaintiffs' final claim is a state law claim for outrage. (DN 1, at PageID # 11-12.) The Kentucky tort of outrage is better known as intentional infliction of emotional distress. *Burgess v. Taylor*, 44 S.W.3d 806, 811 (Ky. Ct. App. 2001). The elements of intentional infliction of

emotional distress are: "1) the wrongdoer's conduct must be intentional or reckless; 2) the conduct must be outrageous and intolerable in that it offends against the generally accepted standards of decency and morality; 3) there must be a causal connection between the wrongdoer's conduct and the emotional distress; and 4) the emotional distress must be severe." *Id.*

Harrison maintains that the emotional distress claim is a "gap-filler" and is unavailable if Harrison committed a traditional tort like assault or battery that already includes recovery for emotional distress. (DN 48-1, at PageID # 169 n. 9.) His argument is that because Plaintiffs' other claims involve excessive force and would include recovery for emotional distress, a standalone claim for intentional infliction of emotional distress must fail. (*Id.*) But this fails to appreciate the gap-filling nature of the claim. While Plaintiffs' other claims do involve excessive force and would allow recovery for emotional distress, there is no guarantee that Plaintiffs will prevail on those claims. If they do, then Plaintiffs will be barred from "double dipping" and recovering for emotional distress via two separate torts. But if Plaintiffs do not prevail on their excessive force claims, they may then fall back on a standalone claim for intentional infliction of emotional distress.

Harrison also argues that the outrage claims fail because the substantive elements of outrage are not met. (*Id.*) However, Harrison offers only one sentence of support for this contention, stating that "nothing in the evidence suggests that Harrison took any action with the sole intent to cause Plaintiffs' purported emotional distress." (*Id.*) This is insufficient to demonstrate to the Court the merits of Harrison's motion on that point. Under Rule 56, Harrison must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" by "citing to particular parts of materials in the record . . . or . . . showing that the materials cited do not establish the absence or presence of a genuine dispute, or

that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(a)-(c).  Harrison's cursory, one-sentence dismissal of Plaintiffs' outrage claims does not meet that standard.  Accordingly, Harrison's motion will be **DENIED** as to the Plaintiffs' state law outrage claims.

## V.    ORDER

For the reasons set forth above, IT IS HEREBY ORDERED that Harrison's Motion for Summary Judgment (DN 48-1) is **GRANTED IN PART** and **DENIED IN PART** as follows:

(1)    The Motion is **GRANTED** as to Plaintiffs' Fourth Amendment false arrest claims and Fourteenth Amendment due process claims.

(2)    The Motion is **DENIED** as to Plaintiffs' Fourth Amendment unreasonable seizure claims and Fourth Amendment excessive force claims and state law claims for assault, battery, and outrage.

Colin H Lindsay, Magistrate Judge
United States District Court

cc:  Counsel of record

November 5, 2020

21